## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 02: 05cr0385-02 |
| | ) | |
| CLARON HANNER | ) | |

### MEMORANDUM OPINION AND ORDER OF COURT

April 19, 2007

On April 2 and 3, 2007, the Court conducted an evidentiary hearing and heard legal arguments on the instant MOTION TO SUPPRESS STATEMENTS filed by Claron Hanner (*Document No. 326*).  Defendant Hanner seeks to suppress statements he allegedly made to Michael Good on January 24, 2006, and to DEA Special Agent Mauricio Jimenez on January 25, 2006.

All parties were represented by counsel who presented and argued the issues skillfully and effectively.  Three witnesses testified during the hearing: United States Deputy Marshal Joseph Moorhead and Michael Good were called by the government; and Special Agent Mauricio Jimenez was called by Defendant Hanner.

Based on the testimony and evidence presented at the suppression hearing, the applicable law, and having made credibility determinations,[1] the Court will deny the Motion to

---

[1]    The determinations turn almost entirely on credibility assessments.  As juries are regularly instructed, there is no magic formula for determining how much weight to give to the testimony of a particular witness, or how to credit testimony which contains discrepancies.  If a witness has testified falsely as to any material fact, the entire testimony of that witness may be disregarded upon the principle that one who testifies falsely about one material fact is likely to testify falsely about everything.  However, such a witness need not be found totally unworthy of belief.  A factfinder may accept so much of the testimony as believed to be true and disregard that which is believed to be false.

Suppress Statements because (i) Michael Good was not acting as an agent of the government when Defendant Hanner made statements to him and (ii) any statements made by Defendant Hanner to Special Agent Jimenez were voluntary and were not made during a custodial interrogation or its functional equivalent.

**Background**

A.        Testimony of United States Deputy Marshal Joseph Moorhead

In January 2006, Defendant Hanner had two pending federal cases (not related to the instant federal case)[2] and had been charged in state court with the homicide of Frank Helisek, Jr.  Defendant Hanner was being detained at the Beaver County Jail ("BCJ").  On January 19, 2006, the United States Marshal Service ("USMS") executed a writ of habeas corpus and picked Defendant Hanner up at the BCJ and lodged him in the Allegheny County Jail ("ACJ").  The next day, January 20, 2006, Defendant Hanner appeared at a status conference before Judge Joy Flowers Conti relative to his two pending federal cases.  At the conclusion of the status conference, Defendant Hanner was returned to the ACJ, to await transport back to the BCJ.

On January 24, 2006, Hanner was moved from the ACJ to a USMS cell block located in the Federal Courthouse.[3]  At the end of the day, Hanner was to be transported back to the

_____

[2]        At Criminal No. 04-34, Defendant Hanner is charged with being a felon in possession of a firearm and possession of a firearm with an obliterated serial number; at Criminal No. 05-102, Defendant Hanner is charged with possession with intent to distribute 5 grams or more of cocaine base, i.e., crack cocaine. Neither of these cases involve events which are part of the charges in this case. Defendant Hanner was indicted in the instant federal case on March 28, 2006.

[3]        The decision to transport Hanner from the ACJ to a holding cell was made by United States Deputy Marshal Dennis Lydon.

BCJ.  While in the USMS cell block, Defendant Hanner was housed next to Larry Ferguson ("Ferguson"), a defendant at the time in an ongoing criminal trial before Judge Joy Flowers Conti.[4]  During breaks in the trial and at lunch, Ferguson was heard telling Hanner about his case and that a former co-defendant in Ferguson's case, Michael Good ("Good") was going to testify against him that day.  Good had pleaded guilty and was currently serving his sentence.  Ferguson called Good a "rat" several times during those conversations.

At the end of the day, United States Deputy Marshal ("USDM") Joseph Moorhead transported Defendant Hanner and two other inmates back to the BCJ.  Although the general policy is not to place incarcerated government witnesses with defendants in transport, due to a lack of manpower on this particular day, Defendant Hanner was transported back to the BCJ with an unidentified inmate and with Good, the same inmate who had testified against Ferguson that day.   The decision to transport Hanner and Good together was made by USDM Moorhead's supervisor, Dennis Lydon.

During the transport to the BCJ, the prisoners were in full restraints with leg irons and had a chain around their waists to which they were handcuffed.  USDM Moorhead testified that he did not tell Good to ask or say anything to Defendant Hanner and never told Good to provoke Defendant Hanner in any manner.  Moreover, USDM Moorhead also testified that no one ever asked him to place Hanner and Good together in the transport vehicle or otherwise.

The return to the BCJ took approximately forty-five (45) minutes to an hour.  During the transport back to the BCJ, USDM Moorhead testified that he could not recall hearing any

---

[4]     *See* United States v. Larry Ferguson, Daniel Matthews, and Roscoe Thompson, Criminal No. 03-72.

conversation or interaction between Hanner and Good, but he did see that Hanner was speaking to Good.   Upon arrival at the BCJ, Good informed USDM Moorhead that Defendant Hanner had called him a "rat," told him that all rats should be killed and said that if Hanner had a chance he would kill the rat.  USDM Moorhead testified that Good appeared to be scared by these threats.

USDM Moorhead immediately advised the BCJ intake officer what Good had told him, and advised the jail personnel to place Hanner in lockdown, and to keep Good separated from everyone else.  USDM Moorhead then notified his supervisor, USDM Dennis Lydon of the threats which Defendant Hanner made to Good.  Within an hour of the incident, USDM Moorhead also notified Assistant U.S. Attorney Troy Rivetti of the threats made against his witness, Good.[5]

The next day, Good was transferred out of the BCJ so that he would not be at the same institution as Hanner.

USDM Moorhead testified that there are restrictions on the USMS regarding the use of prisoners for investigatory purposes, *to wit*:  for an in-custody prisoner to be used in any investigative manner, such as interrogation of another inmate, the requesting agency or the United States Attorney's Office must request through the Department of Justice, Office of Enforcement Operations, the use of the prisoner.  The USMS, who has custody of the prisoner, is then apprised that a law enforcement agency or the United States Attorney's Office has requested permission to use a particular prisoner for investigatory purposes and that such

---

[5]   Assistant United States Attorney Troy Rivetti was the prosecutor in the Ferguson trial.

request has been approved.  USDM Moorhead testified that he knew of no such procedure or application that had been undertaken or applied regarding Good as of January 24, 2006.

B.        Testimony of Michael Good

A federal grand jury sitting in the Western District of Pennsylvania, indicted Good, along with twelve (12) other co-defendants, including Larry Ferguson, Daniel Matthews, and Roscoe Thompson, of various narcotics charges in a nineteen (19) count indictment on February 18, 2003.  *See* Criminal Docket Sheet, No. 03-72.  Good was specifically charged in twelve counts.

On October 23, 2003, Good pled guilty to three counts of the indictment and was sentenced on January 7, 2004 to a term of imprisonment of 190 months.  As part of his plea agreement, however, Good agreed to cooperate with authorities and testify against his former co-defendants.   The trial of Good's former co-defendants, Larry Ferguson, Daniel Matthews, and Roscoe Thompson, commenced in January 2006.   Twice during the trial, Good was called upon to testify as a government witness.[6]

At the instant hearing, Good testified that he had been transported with Defendant Hanner on two separate occasions.  Good first saw Defendant Hanner when the two of them were being transported together from the BCJ to the United States Courthouse.  During that transport, Hanner kept asking him a lot of questions about his case and whether Good used the law library, but Good told him that he did not want to talk.  The next time Good saw Defendant

---

[6]        On January 14, 2007, Good was resentenced to a term of imprisonment of forty-eight (48) months.  He is currently not incarcerated.

Hanner was on January 24, 2006, after Good had testified in the Ferguson trial, and the two men were being transported back to the BCJ.

Good testified that after the two men got into the transport van and were sitting next to one another in the rear seat, Hanner kept leaning over to him and saying that he was going to kill Good.  Hanner told Good that he knew that Good had testified as a government witness against "your brother," that he hated "snitches," and that Hanner was going to kill Good because he did not like snitches.

Good testified that he was scared at hearing Hanner's threats and upon arriving at the BCJ, he immediately informed USDM Moorhead of the threats made by Hanner. The next day, Good was transferred out of the BCJ and moved to a facility in Erie, Pennsylvania.

Good testified that no one from the government ever asked him to get information from Hanner or to provoke Defendant Hanner in any way into threatening him.  Since January of 2006, he has not received any other threats from Defendant Hanner nor has he received any threats on behalf of Defendant Hanner.


C.      Testimony of Special Agent Mauricio Jimenez

Special Agent Jimenez was part of the investigative team in the Ferguson trial.  On the morning of January 25, 2006, he learned of the alleged threats made to Good by Defendant Hanner in a meeting with Assistant United States Attorneys Troy Rivetti, Stephen Kaufman and Tina O. Miller.  He was told that Defendant Hanner had threatened to kill Good because he was a government witness; Special Agent Jimenez was not told that Defendant Hanner had called Good a "rat."

It was decided that Special Agent Jimenez would immediately travel to the BCJ and meet with Defendant Hanner with regard to the alleged threats.  Special Agent Jimenez testified that his meeting with Defendant Hanner was two fold:  first, he wanted to question Defendant Hanner about his threatening of Good; and secondly, he wanted to warn Hanner that the government knew that he had made threats toward a government witness and that the government does not stand for those types of threats.  Special Agent Jimenez did not contact or speak to Good about the alleged threats.

On January 25, 2006, at approximately 12:20 P.M., Special Agent Jimenez, along with his partner Detective Dorian Merlino, met with Defendant Hanner at the BCJ. Initially, Special Agent Jimenez identified himself and his partner to Defendant Hanner, and told Defendant Hanner that Special Agent Jimenez was going to read him his *Miranda* rights. Special Agent Jimenez proceeded to advise Defendant of his *Miranda* rights, which Defendant Hanner invoked by stating that he wanted legal counsel present.  Special Agent Jimenez responded by telling Defendant Hanner that he was going to speak to him, that he was not going to ask him any questions,[7] and that Defendant Hanner was not to respond to anything Special Agent Jimenez said.  Special Agent Jimenez testified that he then proceeded to inform Defendant Hanner that it was his understanding that Defendant Hanner had threatened Good, a government witness, and that the government did not take threats towards its witnesses lightly. Special Agent Jimenez told Defendant Hanner that he was not to "speak, harm, look or in any way" have any type of interaction with Good.

---

[7]        Special Agent Jimenez testified that any questioning or intention to question Defendant Hanner stopped as soon as Defendant Hanner invoked his right to counsel.

Special Agent Jimenez testified that his entire admonishment to Defendant Hanner could not have been more than "two minutes max."  After Special Agent Jimenez finished his statement, Defendant Hanner, almost immediately, proceeded to voice his opinion about the situation.  He stated that he was in a lot of trouble, that he would possibly never see the streets again, that he was innocent of his charges but that he was in jail because of a "rat."  Defendant Hanner also told Special Agent Jimenez that if he had wanted to hurt Good in the transport vehicle, he could have because he was not shackled.  Defendant Hanner also made references to the First Amendment stating that it was Good's First Amendment right to speak his mind during trial and, therefore, it was Defendant Hanner's right to speak his mind as to his opinion regarding government witnesses.

Special Agent Jimenez testified that Defendant Hanner never admitted that he threatened Good; rather, Hanner "spoke his opinions" about his rights under the First Amendment to speak about his dislike of government witnesses. Special Agent Jimenez and his partner were with Defendant Hanner approximately 10 to 15 minutes.

Special Agent Jimenez testified that he did not question Defendant Hanner and it was never his intent nor hope to get any kind of a response from Defendant Hanner.

### Discussion

A.       Statements Made to Michael Good on January 24, 2006

The narrow issue before the Court is whether Good acted as an agent of the government and whether he deliberately elicited statements from Defendant Hanner in violation of his Sixth Amendment right to counsel.

8

The deliberate use of jailhouse informants to elicit incriminating information may violate a defendant's right to counsel. *United States v. Henry,* 447 U.S. 264, 274 (1980); *see also Massiah v. United States,* 377 U.S. 201, 206 (1964). United States Supreme Court precedent establishes that the government violates a pre-trial detainee's right to counsel when it deliberately creates a situation in which a prisoner is likely to make incriminating statements, *Henry,* 447 U.S. at 274, and deliberately uses an informant to elicit information from the prisoner, *Massiah,* 377 U.S. at 206.

Whether an informant's testimony violates the Sixth Amendment turns on the existence of three factors.  First, the right to counsel must have attached at the time that the alleged incriminating statements were made to the informant.  *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 892 (3d Cir. 1999) (en banc).  This right attaches at the initiation of adversarial judicial proceedings "whether by way of formal charge, preliminary hearing, indictment, information, or arraignment."  *Fellers v. United States,* 540 U.S. 519, 523 (2004); *Kirby v. Illinois,* 406 U.S. 682, 689 (1972) (plurality opinion).  Second, the informant must have been working as a government agent.  *Matteo,* 181 F.3d at 892.  At a minimum, this requires some evidence, express or implied, that an agreement existed between the informant and the government at the time the incriminating statements were made.  *Id.* at 893.  *See also United States v. Brink*, 39 F.3d 419, 424 (3d Cir. 1994).  Finally, the informant must have "deliberately elicited" incriminating information from the defendant. *Mateo,* 171 F.3d at 892. To satisfy this prong, the defendant must show more than just the fact that an informant reported his statements to the police.  *Kuhlmann* v. Wilson, 477 U.S. 436, 459 (1986); *Matteo,*

171 F.3d at 895.  Rather, the defendant must show that the informant "affirmatively [sought] to induce [incriminating statements]."  *Id.* at 895-96.

The Court of Appeals for the Third Circuit has held that "[a]n inmate who voluntarily furnishes information without instruction from the government is not a government agent, even if the informant had been an agent in the past."  *United States v. Brink*, 39 F.3d 419, 423 (3d Cir. 1994) (*citing United States v. Van Scoy*, 654 F.2d 257, 260 (3d Cir.), *cert. denied,* 454 U.S. 1126 (1981).

In the present case, the parties hotly contest whether Defendant Hanner has met the first prong of his claim under *Massiah, i.e.,* whether his Sixth Amendment right to counsel had attached.  Defendant Hanner argues that on January 24 and 25, 2006, his right to counsel for Sixth Amendment purposes had attached to the state homicide charge and the federal grand jury investigation.  The government responds that Defendant Hanner's Sixth Amendment right to counsel had not yet attached because the dual sovereignty principle precludes a finding that Defendant Hanner's Sixth Amendment right to counsel in the state court case applies in this federal case.  However, because the Court finds that Defendant Hanner has not met either the second or third prongs of his claim under *Massiah*, the Court need not decide the issue at this time.

     1.    <u>Was Good an Agent Under *Massiah*?</u>

Based on the record evidence and testimony, Defendant Hanner has not established that Good was a government agent under *Massiah* at the time he made the statements at issue.  "The Supreme Court has not formally defined the term 'government agent' for Sixth Amendment purposes."  *Matteo*, 171 F.3d at 893.  Nevertheless, the Court of Appeals

for the Third Circuit has noted, along with most other circuits, that "[a]t a minimum . . . there must be some evidence that an agreement, express or implied, between the individual and a government official existed at the time the elicitation takes place." *Id; see also United States v. Brink,* 39 F.3d 419, 423 (3d Cir. 1994) (requiring a "tacit agreement" between the informant and the government.)

In *Matteo*, our appellate court pointed to a number of different factors that should be considered when deciding whether such an agreement exists:

• Was the informant "acting under instruction" from the government to obtain such information from the defendant?

• Was there a "quid pro quo" in which the informant receive[d] some type of benefit, even if nonpecuniary, in exchange for assisting the authorities?

• Was there a past agency relationship between the informant and the government?

• Was the informant "ostensibly a mere fellow inmate?"

• Was the defendant "in custody at the time" and, therefore, subject to the "subtle influences that will make him particularly susceptible to the ploys of undercover [g]overnment agents?

• Was the informant a "trusted friend" and, therefore, "more likely to" obtain "incriminating statements" from the defendant.

*Matteo,* 171 F.3d at 894-95; *Brink,* 39 F.3d at 423.

Both the testimony of USDM Moorhead and Good himself easily dispose of the first two *Matteo* factors.  The Court finds and rules that the government never instructed Good, explicitly or otherwise, to gather information from Defendant Hanner.   USDM Moorhead testified that he did not tell Good anything about what to say to Defendant Hanner and never told Good to provoke Defendant Hanner.  Moreover, USDM Moorhead testified that he was not aware of any application or approval for Good to be used for investigatory purposes on January

11

24, 2006.   Additionally, Good testified that no one from the government had ever asked him to get information from Defendant Hanner or to provoke Defendant Hanner in any way.

Next, the Court finds that there was no "quid pro quo" between Good and the government in this case.  Good's reduced sentence was not connected in any way to the alleged statements of Defendant Hanner which Good reported to USDM Moorhead.

As to the third *Matteo* factor, the Court finds that Good's history of cooperation with the Government did not turn him into a government agent with regard to this case.  Without dispute, Good provided information and testimony in the Ferguson case.  However, Good's status as a cooperator in other investigation(s) did not convert him into a "roving agent."  *See United States v. Birbal,* 113 F.3d 342, 346 (2d Cir. 1997) (holding informant's agreement with the government to provide "any and all information in his possession relating directly or indirectly to any and all criminal activities or other matters of which he has knowledge," did not transform the informant into a "roving agent").

Notwithstanding Good's history of cooperation, the Court holds that the absence of any instruction or request by the government to cooperate in this case defeats the claim that Good was acting as an agent of the government at the time that Defendant Hanner allegedly made unsolicited statements to him on January 24, 2006.

*Matteo* factors four through six focus on the mental state of the defendant, his vulnerability while incarcerated, his susceptibility to artifice, and the likelihood that he will expose incriminating information to others.  None of this demonstrates any link between Good and the government and, therefore, is arguably irrelevant to the government agency inquiry.

Finally, our Court of Appeals has found the existence of the third, fourth, and fifth factors, taken together, are insufficient to satisfy the government agency under *Massiah*.  In *Brink,* for instance, the defendant had proven that: (i) the informant "presented himself as just another inmate"; (ii) the defendant "was in custody at the time the informant engaged him in conversations"; and (iii) the informant acted 'as a government agent in other cases." *Brink,* 39 F.3d at 423-24.  The appellate court explained, however, that these factors, without more, were insufficient to demonstrate government agency under *Massiah.  Id.*

Accordingly, based on the testimony adduced during the evidentiary hearing, credibility determinations, and fact findings, the Court determines that Good was not a government agent under *Massiah* on January 24, 2006, at the time that Defendant Hanner allegedly made statements to him.

### 2.    Did Good Deliberately Elicit Any Statements from Defendant Hanner?

The Court also finds and rules that Defendant Hanner has not demonstrated that Good deliberately elicited any statements from him. The primary concern of *Massiah* "is secret interrogation by investigatory techniques that are the equivalent of direct police investigation." *Kuhlmann,* 477 U.S. at 459.  For this reason, a defendant cannot prove deliberate elicitation "simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police.  Rather, the defendant must demonstrate that the police and their informant took some action, beyond mere listening that was designed deliberately to elicit incriminating remarks." *Id.*

In the present case, the record is completely devoid of any evidence that Good deliberately elicited statements from Defendant Hanner.  To the contrary, the evidence reflects that Defendant Hanner initiated the "conversation."

For the foregoing reasons, the Defendant Hanner's motion to suppress his statement(s) of January 24, 2006, will be denied.


B.        Statements Made to Special Agent Jimenez

Defendant Hanner contends that his statements to Special Agent Jimenez on January 25, 2006 raise both a Fifth and Sixth Amendment violation.  Defendant Hanner argues that instead of "scrupulously honoring" the invocation of his Miranda rights, Special Agent Jimenez "began 'advising' Mr. Hanner of the government's position regarding Mr. Good and admonishing Mr. Hanner for threatening Good."  Def's Memo. at 3.  Defendant Hanner also asserts that his Sixth Amendment right to counsel prohibits the admissibility of any statements made to Special Agent Jimenez because his right to counsel had attached to the state homicide charge and the federal grand jury investigation, which resulted in this indictment.

The presence of both a custodial setting and an official interrogation is required to trigger *Miranda's* right to counsel.  In the absence of either element, *Miranda* is not implicated. The parties do not dispute that the meeting between Special Agent Jimenez and Defendant Hanner occurred while Defendant Hanner was in a "custodial setting."  Therefore, the Court must determine whether Special Agent conducted an "official interrogation" when he met with Defendant Hanner on January 25, 2006 at the BCJ.

14

Under *Miranda*, a suspect in custody is protected from the " 'functional equivalent' of interrogation, that is [from] 'any words or actions on the part of the police (other than those normally attendant upon arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1982). Analysis of whether particular words or conduct are likely to elicit incriminating statements "focuses primarily upon the perceptions of the suspect, rather than on the intent of the police." *Id.*

It is important to consider this case with reference to the circumstances at the time that Defendant Hanner made his statements to Special Agent Jimenez. Special Agent Jimenez testified that the meeting on January 25, 2006 with Defendant Hanner was cordial and that Defendant Hanner showed no signs of being emotionally upset or overwrought.

Based on the testimony presented at the suppression hearing, the Court finds and rules that Special Agent Jimenez did not interrogate Defendant Hanner, but merely admonished him for the comments he made to Michael Good. There were no questions asked and the statements of Special Agent Jimenez to Defendant Hanner were neither intended nor can reasonably be interpreted to elicit an incriminating response. Accordingly, Special Agent Jimenez did not conduct a custodial interrogation or its functional equivalent. The Court finds that Defendant Hanner's statements were simply gratuitous and Defendant's motion to suppress same will be denied.[8]

---

[8]    Because the Court has found that there was no "interrogation," it need not decide whether Defendant's Hanner Sixth Amendment right to counsel attached as to this case.

15

**Conclusion**

For all the following reasons, the Motion to Suppress Statements filed by Defendant Claron Hanner will be denied.

An appropriate Order follows.

McVerry, J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 02: 05cr0385-02 |
| | ) | |
| CLARON HANNER | ) | |

**ORDER OF COURT**

AND NOW, this 19th day of April, 2007, in accordance with the foregoing

Memorandum Opinion, it is hereby **ORDERED, ADJUDGED AND DECREED** that the

MOTION TO SUPPRESS STATEMENTS filed by Claron Hanner is **DENIED.**


BY THE COURT:

s/Terrence F. McVerry
United States District Court Judge

cc:    Tina O. Miller , Esquire
        Assistant U.S. Attorney
        Email: tina.o.miller@usdoj.gov

        Leo M. Dillon,
        Assistant U.S. Attorney
        Email: Leo.Dillon@usdoj.gov

        Martin A. Dietz, Esquire
        Email: MDietzEsq@aol.com

        Robert E. Stewart , Esquire
        Email: restjs@msn.com

        Caroline M. Roberto, Esquire
        Email: croberto@choiceonemail.com

        Jay T. McCamic , Esquire
        McCamic, Sacco, Pizzuti & McCoid, PLLC
        Email: jtmccamic@mspmlaw.com